RECEIVED
IN LAKE CHARLES, LA

MAY 2 1 2007

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

JENNIFER BRUNEY RICHARD,          :     DOCKET NO. 2:06 CV 1452
INDIVIDUALLY, AND ON BEHALF
OF THE ESTATE OF DEWEY
BRUNEY AND ALL OTHERS
SIMILARLY SITUATED

VS.                               :     JUDGE MINALDI

WAL-MART STORES, INC., AND        :     MAGISTRATE JUDGE WILSON
WAL-MART STORES, INC.
CORPORATION GRANTOR TRUST,
THROUGH WACHOVIA BANK OF
GEORGIA, N.A.

## MEMORANDUM RULING

Presently before the court is a Motion for Partial Summary Judgment [doc. 44][1] filed by the

defendants, Wal-Mart Stores, Inc. and Wal-Mart Stores, Inc. Corporation Grantor Trust, through

Wachovia Bank of Georgia, NA (collectively referred to as "Wal-Mart").  Wal-Mart asserts that the

plaintiff cannot show that the defendants were in any way enriched at the expense of Wal-Mart, or

that any supposed enrichment was unjust under the circumstances.

Facts

There was a widespread corporate practice in the 1980s and 1990s of purchasing "broad-

based, leveraged" Corporate Owned Life Insurance ("COLI") plans to take advantage of the tax-

favored treatment afforded whole life insurance.  Wal-Mart is one of many companies that instituted

---

[1]     The court *sua sponte* requested a motion for partial summary judgment on the
plaintiff's unjust enrichment claim in an Order dated March 28, 2007.

a COLI program. This program began in late 1993 and ended in early 2000.[2]

The fundamental characteristic of COLI is that the corporate employer pays the premium for, and is the beneficiary of, life insurance on the lives of employees.[3] Changes in financial accounting requirements in the mid 1980s popularized what are known as "broad-based" leveraged COLI programs, a tax-driven transaction through which a corporate employer purchases life insurance proceeds on the lives of an actuarially predictable population of its employees.[4]

In December, 1993, Wal-Mart established the Wal-Mart Stores Corporation Grantor Trust ("Trust") in Georgia to act as the legal holder of, and recipient of performance under, any COLI policies to be issued insuring the lives of Wal-Mart employees residing in virtually all fifty states.[5] From December 1993 until July 1995, the Trust periodically purchased, from AIG and Hartford Life Insurance Company ("Hartford"), COLI policies covering more than 350,000 of Wal-Mart's "associates" (employees).[6] COLI policies purchased from AIG insured hourly-rate employees. Those purchased from Hartford insured salaried employees.[7] The first block of AIG COLI policies, purchased on December 28, 1993 insured 197,180 hourly-rate employees of Wal-Mart.

In purchasing these COLI policies, through the Trust, Wal-Mart provided AIG and Hartford with basic information on employees, consisting of: name, social security number, sex, date of birth,

---

[2]     Affidavit of Thomas G. Emerick, Defendant's Exh. 2 at ¶ 4.

[3]     Affidavit of Thomas G. Emerick, Defendant's Exh. 2 at ¶ 2.

[4]     Affidavit of Thomas G. Emerick, Defendant's Exh. 2 at ¶ 5.

[5]     Affidavit of Thomas G. Emerick, Defendant's Exh. 2 at ¶¶ 6-7.

[6]     Affidavit of Thomas G. Emerick, Defendant's Exh. 2 at ¶ 7.

[7]     Affidavit of Thomas G. Emerick, Defendant's Exh. 2 at ¶ 8.

2

state and zip code of residence, and annual compensation.[8]  All of the premiums and other costs of the COLI policies the Trust purchased were funded by Wal-Mart.  The COLI policies did not cost the employees anything.[9]

The Wal-Mart COLI plans were "experience rated," meaning that the actual "cost of insurance" was adjusted periodically to account for actual mortality experience within the pool of insured associates.  The defendant asserts that the policies were designed in such a way as to assure that Wal-Mart would not and could not benefit from the deaths of insured employees and that the financial benefits to the company would flow from the favorable tax treatment.  These policies were enhanced (would continue to accrue) by the continued lives of the insured employees.  The policies were permanent whole life insurance policies and were not renewable from year to year, but were designed to accumulate cash value through payment of premiums and remain in effect throughout the life of the insured employee.[10]

The plaintiff is the representative of the estate of Dewey Bruney, a former Wal-Mart associate who was allegedly covered by a Wal-Mart COLI policy.  The plaintiff is alleging that the COLI policies violate La. R.S. 22:613 et seq.,or presumably in the alternative, that she is entitled to the COLI insurance proceeds.  The plaintiff asserts that Wal-Mart was unjustly enriched when it received the proceeds of the policy on Dewey Bruney's life.  Wal-Mart asserts that the unjust enrichment claim must fail as the plaintiff cannot satisfy most, if any, of the elements required for unjust enrichment.

---

[8]      Affidavit of Thomas G. Emerick, Defendant's Exh. 2 at ¶ 15.

[9]      Affidavit of Thomas G. Emerick, Defendant's Exh. 2 at ¶ 9.

[10]      Affidavit of Thomas G. Emerick, Defendant's Exh. 2 at ¶¶ 8 and 24.

3

Summary Judgment Standard

Summary judgment is appropriate when the movant is able to demonstrate that the pleadings, affidavits, and other evidence available to the Court establish that there are no genuine issues of material fact, and that the moving party is entitled to summary judgment as a matter of law.[11] When the nonmoving party has the burden of proof on an issue, the movant must state the basis for the motion and identify those portions of the pleadings, depositions, admissions, answers to interrogatories, together with affidavits, that demonstrate the absence of a genuine issue of material fact.[12] A mere conclusory statement that the other side has no evidence is not enough to satisfy a movant's burden.[13]

Once the movant has shown the absence of material factual issues, the opposing party has a duty to respond, via affidavits or other means, asserting specific facts demonstrating that there is a genuine issue for trial.[14] The Court must view the evidence introduced and all factual inferences

---

[11]    Fed.R.Civ.P. 56(c); See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. 2548, 2552-54, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); and *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-88, 106 S.Ct. 1348, 1355-57, 89 L.Ed.2d 538 (1986).

[12]    A "material" fact is one that might affect the outcome of the suit under the applicable substantive law. *Anderson*, 477 U.S. at 248,106 S.Ct. at 2510. In order for a dispute to be "genuine," the evidence before the Court must be such that a reasonable jury could return a verdict for the nonmoving party. *Id.*, see also, *Judwin Properties, Inc. v. United States Fire Ins. Co.*, 973 F.2d 432, 435 (5th Cir.1992); *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *Topalian v. Ehrman*, 954 F.2d 1125, 1131-32 (5th Cir.1992), cert. denied, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

[13]    See *Celotex*, 477 U.S. at 328, 106 S.Ct. at 2555.

[14]    Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514; *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

4

from the evidence in the light most favorable to the party opposing summary judgment.[15] However,

a party opposing summary judgment may not rest on mere conclusory allegations or denials in his

pleadings.[16]

Law

The doctrine of unjust enrichment, otherwise known as *actio de in rem verso*, is codified by

La.Civ.Code art. 2298, which provides:

> A person who has been enriched without cause at the expense of another person is
> bound to compensate that person. The term "without cause" is used in this context
> to exclude cases in which the enrichment results from a valid juridical act or the law.
> The remedy declared here is subsidiary and shall not be available if the law provides
> another remedy for the impoverishment or declares a contrary rule.

A party seeking to recover pursuant to the theory of unjust enrichment bears the burden of proving

five elements: (1) there must be an enrichment, (2) there must be an impoverishment, (3) there must

be a connection between the enrichment and the resulting impoverishment, (4) there must be an

absence of "justification" or "cause" for the enrichment and impoverishment, and (5) there must be

no other remedy at law available to plaintiff.[17] A plaintiff has the burden of proving each element

of unjust enrichment by a preponderance of the evidence.[18]

---

[15]      *Eastman Kodak v. Image Technical Services*, 504 U.S. 451, 456-58, 112 S.Ct.
2072, 2077, 119 L.Ed.2d 265 (1992); *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

[16]      Fed.R.Civ.P. 56(e); see also *Topalian*, 954 F.2d at 1131.

[17]      *Moroux v. Toce*, 943 So.2d 1263, 2006-831 (La.App. 3 Cir. 2006);  *Baker v.
Maclay Properties Co.,*  2007 WL 1300820, *1 (La.App. 1 Cir. 2007); *Baker v. Maclay
Properties Company*, 94-1529 (La.1/17/95), 648 So.2d 888, 897. *See also,* La. Civ.Code art.
2298.

[18]      *Tandy v. Pecan Shoppe of Minden, Inc.,* 785 So.2d 111, 117, 34,578 , **8
(La.App. 2 Cir. 2001) *Caldwell Wholesale Co., Inc., supra; Harper v. Kennedy,* 561 So.2d 830

5

The plaintiff argues that Wal-Mart was enriched when it received the proceeds from the COLI policy[19] insuring the life of its associates.  The affidavit of Thomas G. Emerick states that Wal-Mart did not benefit via the receipt of any insurance proceeds.  The program was structured to be a net-zero payment on proceeds and Wal-Mart asserts that it actually lost tens of millions of dollars on the plan.[20]  The plaintiff argues that Emerick admitted that he is not competent to testify about the mechanics of Wal-Mart's policies and Richard asserts that Emerick's testimony about the tax treatment of those policies is incomplete, incompetent, and conclusory, yet Richard does not provide the court with any basis for this assertion.

The defendant asserts that the plaintiff was not impoverished because Wal-Mart paid the premiums for the COLI policies and the Bruney paid nothing.  The plaintiff argues this is not a simple matter of who paid the premiums.  Richard argues that Bruney was impoverished by the unauthorized misappropriation of the deceased's identity.[21]  Richard argues that a person's identity is his or her property citing the Restatement (Second) of Torts §652C, which notes that a person has the exclusive use of his own identity and that the identity is in the nature of a property right.[22]  The

---

(La.App. 2d Cir.1990).

[19]     See also plaintiff's Answer to Interrogatory No. 16.

[20]     Affidavit of Emerick, ¶ 35.

[21]     Amended Complaint ¶26, et seq.  The plaintiff alleges that "Dewey Bruney's identity was his property.  He had the right to determine who could insure his life and profit from his death.  He was entitled to license the use of his identity to serve as the basis for a life insurance policy. Through license or assignment, Bruney was entitled to demand a fee or that his estate receive a portion of the policy proceeds. Wal-Mart and the Trust took that right from Dewey Bruney when it insured his life without a license and without consideration for the use of his identity."

[22]     Restatement (Second) of Torts §652C cmt. a & b (1977).

6

plaintiff argues that Dewey possessed the "exclusive use" of his identity and could have transferred it by license. Richard asserts that Wal-Mart disclosed Dewey's social security number and other identifying information in securing the COLI policies in violation of Dewey's privacy rights.

This argument by the plaintiff is based upon common law principles which have not been fully embraced by the civil law. Louisiana law recognizes identity rights but the question of whether Louisiana law supports a patrimonial right to the identity, commonly referred to as the right of publicity in common law, is open to discussion.[23] Louisiana has long viewed one's personal connection with the identity as an extrapatrimonial "personality right" incapable of pecuniary valuation.[24] Louisiana has a codified right to privacy[25] and a general tort provision,[26] each of which, supply an independent legal basis for recovering both non-pecuniary, moral damages and pecuniary commercial damages for a violation of one's right to be secure in his image.[27] "A few cases involving a personal, private right in one's image have passed through Louisiana's courts, though not one Louisiana appellate court has recognized a plaintiff assert a right to the commercial value of his identity"[28] which is what the plaintiff in the case at bar is now asserting.

The concept of protecting the personality is established in Louisiana law, yet "personality"

---

[23]    Patrick Broyles, *Intercontinental Identity: The Right to the Identity in the Louisiana Civil Code*, 65 La. L. Review 824 (2004-2005).

[24]    *Id.* at 825; see also A.N. Yiannapoulos Property, note 5, at §§17, 201, in 2 Louisiana Civil Law Treatise (4th ed. 2001).

[25]    *See* La. Const. art. 1, §5.

[26]    *See* La. Civ. Code art. 2315.

[27]    Broyles, *supra* note 23, at 825.

[28]    *Id.* at 825.

7

denotes a purely extrapatrimonial concept incapable of alienation or appropriation.[29]

In *Jaubert v. Crowley Post-Signal, Inc.,* 375 So. 2d 1386, 1388 (La. 1979), the Louisiana

Supreme Court adopted Prosser's four privacy torts:

> The right of privacy embraces four different interests, each of which may be invaded
> in a distinct fashion; *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029,
> 43 L.Ed.2d 328 (1975); Prosser, Law of Torts, 4th ed. (1971); Prosser, Privacy, 48
> Calif.L.Rev. 383 (1960); Restatement Second of the Law of Torts (1959). One type
> of invasion takes the form of the appropriation of an individual's name or likeness,
> for the use or benefit of the defendant. While it is not necessary that the use or benefit
> be commercial or pecuniary in nature, the mere fact that a newspaper is published for
> sale does not constitute such use or benefit on the part of the publisher. Another type
> of invasion occurs when the defendant unreasonably intrudes upon the plaintiff's
> physical solitude or seclusion. Because the situation or activity which is intruded
> upon must be private, an invasion does not occur when an individual makes a
> photograph of a public sight which any one is free to see; Prosser, Law of Torts, 809.
> A third type of invasion consists of publicity which unreasonably places the plaintiff
> in a false light before the public. While the publicity need not be defamatory in
> nature, but only objectionable to a reasonable person under the circumstances, it must
> contain either falsity or fiction. A fourth type of invasion is represented by
> unreasonable public disclosure of embarrassing private facts. With reference to this
> category, Prosser states that "(i)t seems to be generally agreed that anything visible
> in a public place can be recorded and given circulation by means of a photograph, to
> the same extent as by a written description, since this amounts to nothing more than
> giving publicity to what is already public and what anyone present would be free to
> see." Law of Torts, 811. Similarly, the Restatement Second of the Law of Torts
> indicates that "there is no liability for giving further publicity to what the plaintiff
> himself leaves open to the public eye."

*Jaubert v. Crowley Post-Signal, Inc.,* 375 So.2d 1386, 1388 (La., 1979).

In *Prudhomme v. Proctor & Gamble, Co.*, 800 F. Supp. 390 (E.D. La. 1992), chef Paul

Prudhomme sued Proctor & Gamble for the defendant's use of a Prudhomme look-alike in a Folgers

Coffee Commercial. One assertion in the complaint was that Proctor & Gamble had infringed on

---

[29]     *See* Yiannopoulos, *supra* note 5, §§ 17, 201, 203.

8

Prudhomme's "common law right of publicity."[30]  Proctor & Gamble argued that Louisiana had not

recognized such a right and the privacy rights in Louisiana were limited to Prosser's four privacy

torts adopted by the Louisiana Supreme Court in *Jaubert.*  Prudhomme cited common law and the

Restatement (Second) of Torts as the basis for his claim.  The district court stated:

> While Louisiana courts have not explicitly adopted this right, they have not
> specifically precluded it, either. Plaintiffs have made a good faith argument for
> extension of the law in Louisiana on this topic, and should not be prevented from
> presenting an argument on this issue at this early stage in the proceedings.

*Prudhomme v. Procter & Gamble Co.,* 800 F.Supp. 390, 396 (E.D.La. 1992).  Still, no Louisiana

court directly addressed the question of whether Louisiana law recognizes a pecuniary right in the

identity such is being claimed by Richard.

The Louisiana Constitution of 1974, Art. I, s 5, entitled "Right to Privacy," provides in

pertinent part: "Every person shall be secure in his person, property, communications, houses,

papers, and effects against unreasonable searches, seizures, or invasions of privacy." This sections

reference to a right to privacy represents a change from the language of earlier constitutions. A

review of Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts

leaves open the question of whether the section was intended to provide constitutional protection

against private conduct. Generally, the provision seems to have been drafted as a counterpart to the

United States Constitution's Fourth Amendment prohibition against governmental searches and

seizures and other forms of "authoritarian intrusion." Transcripts, Vol. VI, 1072. However, in The

Declaration of Rights of the Louisiana Constitution of 1974, 35 La.L.Rev. 1 (1974), Professor

---

[30]     *Prudhomme v. Proctor & Gamble, Co.*, 800 F. Supp. 390, 395-396 (E.D. La. 1992)

9

Hargrave concluded that the protection afforded by this provision is not limited to state action because the phrase "no law shall . . ." is conspicuously absent and because the provision does not appear among those sections dealing with procedural rights in criminal cases. He predicted that the provision would be a fertile field for future developments in the law of torts. At least one delegate was also of the opinion that "this proposal protects a person not only from state action but also from private action." Transcripts, Vol. VI, 1076.[31]

The Louisiana Supreme Court in *Jaubert* distinguished this constitutional right to privacy from the individual's private tort cause of action for invasion of privacy:

> The right to privacy under discussion here is one which protects the individual against private action and is grounded in tort. It should be distinguished from the constitutional right to privacy which the United States Supreme Court, in a line of cases, has found to emanate from certain provisions of the Bill of Rights and to protect, from governmental invasion only, those personal rights which are deemed fundamental or implicit in the concept of ordered liberty.[32]

The Louisiana Supreme Court noted, however, that the Constitution Convention transcripts did not mention limiting the article to governmental intrusion.[33]

The court in *Jaubert* recognized a cause of action predicated upon Louisiana Civil Code article 2315:

> In Louisiana jurisprudence, the right to privacy has been variously defined as "the right to be let alone" and "the right to an 'inviolate personality.' " *Pack v. Wise*, 155 So.2d 909, 913 (La.App. 3d Cir. 1963), quoting *Hamilton v. Lumbermen's Mut. Cas. Co.*, 82 So.2d 61, 63 (La.App. 1st Cir. 1955), writ denied 1955. Where an individual

---

[31]     *Jaubert v. Crowley Post-Signal, Inc.*, 375 So.2d 1386, 1388 (La., 1979).

[32]     *Id.*, at 1388.

[33]     Broyles, *supra* note 2, at 855.

10

has such a right, in the form of one of the interests outlined above, other members of society have a corresponding duty not to violate that right. A violation constitutes a breach of duty, or fault, and may be actionable under C.C. 2315, which provides that "(e)very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." *Pack v. Wise, supra; Tuyes v. Chambers*, 144 La. 723, 81 So. 265 (1919). Where no such right to privacy exists, however, a person's conduct may be the cause of another person's embarrassment, discomfiture, or monetary loss, but it will not constitute a "legal cause," because no duty has been breached.[34]

The last element of Louisiana Civil Code art. 2298, *supra*, is that there must be no other remedy at law available to the plaintiff. The existence of potential remedies under the Louisiana Constitution and Civil Code article 2315 removes this case from the purview of article 2298.

Accordingly, the plaintiff's cause of action of unjust enrichment fails and the defendant's motion for partial summary judgment on this claim will be granted.

Lake Charles, Louisiana, this ___ day of May, 2007.



PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE

---

[34] *Jaubert*, 375 So.2d at 1388 -1389.

11